UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

DONALD BLANKENSHIP, JR.

    *Petitioner*,

vs.

LENARD VARE, *et al.*,

    *Respondents*.

3:08-cv-00641-LRH-VPC

ORDER

This habeas matter under 28 U.S.C. § 2254 comes before the Court for a final decision on the two claims remaining, Ground 1(f) and Ground 3.

### *Background*

Petitioner Donald Blankenship challenges his 2002 Nevada state conviction, pursuant to a jury verdict, of three counts of sexual assault of a child under the age of fourteen. Petitioner challenged the conviction on direct appeal and also on state post-conviction review.

Consideration of the claim of ineffective assistance of counsel in Ground 1(f) involves a consideration of the overall evidence of guilt at trial. On direct appeal, the Supreme Court of Nevada summarized the trial evidence as follows:

> Donald [Blankenship] and his former wife, Cynthia L., had three children: L.B., D.B., and G.B. In 2002 at the time of trial, L.B. was eighteen years old, D.B. was fifteen years old, and G.B. was thirteen years old. In 1996, the family moved from Washington to Lyon County, Nevada, where they lived in a tent for about a month. L.B. alleged that Donald sexually assaulted her on three specific occasions from the time she was twelve years old. All family members corroborated the places they lived and the times they lived there.

L.B. testified that the first incident of abuse occurred when the family lived in a tent. L.B. testified that Donald made her perform oral sex on him and she provided additional details of the incident. L.B. was twelve years old when this incident occurred.

After living in a tent, the family moved to Mobile Village in Yerington and lived in a trailer. While living in the trailer, the second sexual assault occurred. L.B. testified that Donald made her have sex with him. L.B. stated that her sister was reading a book and her brother was playing with clay when the assault occurred.

After living in the trailer, Cynthia and Donald divorced. Cynthia and the children lived in a two-bedroom apartment in Yerington, and Donald lived in a recreational vehicle (RV) outside the apartment. L.B. testified that while they were living in the apartment, Donald sexually assaulted her for the third time. L.B. was thirteen years old when this assault occurred. She testified that her mom was at work and her brother and sister were at school. L.B. stayed home from school that day. L.B. testified that Donald had sex with her in the RV.

During her freshman year of high school when L.B. was fourteen years old, she met with Child Protective Services (CPS) because they received an anonymous report that she had been sexually abused. L.B. denied the abuse allegations because she thought that if she told CPS about the abuse, they would remove her from her home. She denied the allegations also because she felt embarrassed and uncomfortable. L.B. finally reported Donald to CPS and spoke with Sevana Newman. Newman, a CPS social worker with twenty years of experience, investigated L.B.'s allegations against Donald. L.B. later told Officer Spinuzzi, the police officer who investigated L.B.'s allegations, that Donald sexually abused her. Based on her training and experience, Newman testified that it is not uncommon for victims of sexual abuse to deny the allegations. Defense counsel questioned Newman about the 1999 CPS report from school stating that "[L.B.] presents as an articulate 15-year old who is able to determine the appropriateness of relationships." At that time, the CPS social worker thought that L.B. was comfortable with confiding in her. The CPS report also revealed that Cynthia felt that Donald was not capable of sexual abuse.

D.B., L.B.'s sister, said that she did not believe that Donald had molested L.B. D.B. stated that L.B. was not an honest person. D.B. never saw any sexual abuse between Donald and L.B. D.B. testified that if Donald and L.B. had had sex around Christmastime, she would have noticed it. She also testified that there was never any sexual conduct between herself and Donald.

G.B., L.B.'s brother, testified that he never saw sexual contact between Donald and L.B. Donald never touched G.B. inappropriately either. G.B. stated that the reason he and Donald left town during the summer of 2001 was because rumors got around and Donald could not get a job. G.B. agreed with his sister, D.B., that L.B. is not honest and can lie. G.B. also testified that if L.B. and Donald had sexual contact, he would have known it happened.

After L.B. reported the sexual assault to CPS, Officer Spinuzzi

> and Newman interviewed her. During the interview, L.B. told Officer Spinuzzi about the sexual abuse allegations. After the interview, Officer Spinuzzi went to the canyon area to investigate L.B.'s allegations. He also confirmed that the family lived where the first incident of abuse allegedly occurred. On June 12, 2001, Officer Spinuzzi interviewed Donald with D.B. and G.B. present. In another interview, Officer Spinuzzi confronted Donald about leaving town and Donald indicated that he was considering it. Defense counsel also questioned Officer Spinuzzi regarding Donald's move during the investigation.
>
> In July 2001, G.B. and Donald moved from Nevada to Texas and then to Tennessee. They left early in the morning, and G.B. did not say goodbye to his mother or sisters. Cynthia testified that it was unusual for G.B. not to say goodbye. Cynthia next heard from G.B. when the police had him in custody in Tennessee. Donald never told Cynthia that they were going to Tennessee.
>
> The police arrested Donald while he was in Tennessee with G.B.
> . . . .

#25, Ex. 54, at 1-4.

Petitioner has not disputed the state supreme court's summary of the trial evidence in its decision on direct appeal with a showing of clear and convincing evidence in the state court record to the contrary. The state high court's summary of the evidence thus is presumed to be correct. *See, e.g., Sims v. Brown*, 425 F.3d 560, 563 n.1 (9th Cir. 2005).

### ***Standard of Review on the Merits***

The Antiterrorism and Effective Death Penalty Act (AEDPA) imposes a "highly deferential" standard for evaluating state-court rulings that is "difficult to meet" and "which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 131 S.Ct. 1388, 1398 (2011). Under this highly deferential standard of review, a federal court may not grant habeas relief merely because it might conclude that the state court decision was incorrect. 131 S.Ct. at 1411. Instead, under 28 U.S.C. § 2254(d), the court may grant relief only if the state court decision: (1) was either contrary to or involved an unreasonable application of clearly established law as determined by the United States Supreme Court based on the record presented to the state courts; or (2) was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. 131 S.Ct. at 1398-1401.

A state court decision is "contrary to" law clearly established by the Supreme Court only if it applies a rule that contradicts the governing law set forth in Supreme Court case law or if the decision

confronts a set of facts that are materially indistinguishable from a Supreme Court decision and nevertheless arrives at a different result. *E.g.*, *Mitchell v. Esparza*, 540 U.S. 12, 15-16, 124 S.Ct. 7, 10, 157 L.Ed.2d 263 (2003). A state court decision is not contrary to established federal law merely because it does not cite the Supreme Court's opinions. *Id.* Indeed, the Supreme Court has held that a state court need not even be aware of its precedents, so long as neither the reasoning nor the result of its decision contradicts them. *Id.* Moreover, "[a] federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous." 540 U.S. at 16, 124 S.Ct. at 11. For, at bottom, a decision that does not conflict with the reasoning or holdings of Supreme Court precedent is not contrary to clearly established federal law.

A state court decision constitutes an "unreasonable application" of clearly established federal law only if it is demonstrated that the state court's application of Supreme Court precedent to the facts of the case was not only incorrect but "objectively unreasonable." *E.g., Mitchell*, 540 U.S. at 18, 124 S.Ct. at 12; *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004).

To the extent that the state court's factual findings are challenged, the "unreasonable determination of fact" clause of Section 2254(d)(2) controls on federal habeas review. *E.g., Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004). This clause requires that the federal courts "must be particularly deferential" to state court factual determinations. *Id*. The governing standard is not satisfied by a showing merely that the state court finding was "clearly erroneous." 393 F.3d at 973. Rather, AEDPA requires substantially more deference:

> . . . . [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972.

Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be correct unless rebutted by clear and convincing evidence.

The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief. *Pinholster*, 131 S.Ct. at 1398.

*Discussion*

*Ground 1(f)*

In Ground 1(f), petitioner alleges that he was denied effective assistance of counsel when his trial counsel elicited testimony on cross-examination of an investigating officer as to other bad acts, allegedly denying petitioner a fair trial in violation of the Sixth Amendment. Petitioner alleges that counsel elicited testimony that he had a violent criminal history, including armed assaults; that the State had found it necessary to remove his children from the home; that he had been jailed for domestic violence and had engaged in a recent act of domestic violence involving the victim; and that there was a real possibility that he had sexually molested his other daughter, D.B.

The first exchange in question occurred while counsel was seeking to establish that Blankenship had not fled the jurisdiction but instead had informed law enforcement that he was leaving, in connection with their holding his firearm. The first exchange elicited the following testimony:

> Q: Now, Mr. Blankenship told you that he was planning on leaving, correct?
>
> A: He said he was considering it, yes, sir.
>
> Q: Isn't it true that after a while – well, you took his gun, didn't you, at one point in time?
>
> A: Yes, sir.
>
> Q: He legally – it was a legal gun, right?
>
> A: Yes, sir.
>
> Q: Now, I mean, he – he had the gun legally and where he was correct? Was it in his house?
>
> A: Yes, sir.
>
> Q: Now, why did you want his gun?
>
> A: Mr. Blankenship had a criminal history that included armed assaults. And because of the nature of these crimes, and his children having been taken out of the home, I requested from Mr. Blankenship that I could have the gun for safekeeping, in which case it was taken to the sheriff's office and placed in holding.
>
> Q: Okay. Now, isn't it true, though, that you said that he had a *history*? Is that what you said?

| | | |
|---|---|---|
| 1 | A: | Yes, sir. |
| 2 | Q: | *He didn't have a prior felony, correct?* |
| 3 | A: | *Not to my knowledge, no, sir.* |
| 4 | Q: | *In fact, you can't testify that he's ever been in jail, can you?* |
| 5 | A: | *Yes, sir.* |
| 6 | Q: | Other than this incident? |
| 7 | A: | *Yes, sir.* |
| 8 | Q: | Okay. Not for – that was for domestic battery? |
| 9 | A: | Yes, sir. |

#24-32, Ex. 24-E, at 484-85 (emphasis added). See also *id.*, at 477 & 483.

In the second exchange in question, trial counsel attempted to highlight, and in truth ridicule, the inherent subjectivity involved in the investigating officer's assumptions as to who was telling the truth as between the two daughters. The second exchange elicited the following testimony:

| | | |
|---|---|---|
| 14 | Q: | This is a tough case to investigate, correct? |
| 15 | A: | Yes, sir. |
| 16 | Q: | And the reason is you have one person saying something happened, right? |
| 17 | | |
| 18 | A: | Yes, sir. |
| | Q: | And you have another person denying it, right? |
| 19 | A: | Yes, sir. |
| 20 | Q: | So you have to rely on other things, indicia, on reliability of other things, correct? |
| 21 | | |
| 22 | A: | Yes. |
| 23 | Q: | So the best way to do that is to get to people who know [L.B.]? |
| 24 | A: | That's one way. |
| 25 | Q: | Another way is to – well, that's a pretty important one, isn't it? |
| 26 | | |
| 27 | A: | Yes, sir. |
| 28 | Q: | And are you aware, of course, that [D.B.], her sister, |

-6-

|   |   |   |
|---|---|---|
| 1 |   | doesn't believe that she is truthful? |
| 2 | A: | I attempted to interview [D.B.] at one point, and Mr. Blankenship was right there next to her. And there – it was a very frustrating few minutes, because it was extremely obvious that he had told her exactly what to say, and she wasn't going to talk to me. |
| 5 | Q: | Is that right? |
| 6 | A: | Yes, sir. |
| 7 | Q: | Are you saying that [D.B.] was somehow hiding information from you? |
| 8 | A: | I'm saying that in a case like this, it's extremely complex. And when you're talking about these types of allegations, it's very normal, especially for a girl child, to protect her father. |
| 11 | Q: | So are you saying that [D.B.] was molested too? I'm curious about where this conversation is going. |
| 12 | A: | I'm saying based upon the investigation and all the events leading to the lifestyle and so on, that it's entirely possible. |
| 14 | Q: | Is your ESP working now, sir? |
|   | MR. RYE: | Objection. Argumentative. |
|   | THE COURT: | It's argumentative. Sustained. |
|   | MR. WARD: | I'm sorry. |
|   | BY MR. WARD: |   |
| 19 | Q: | Are you saying you completely discounted what [D.B.] would say forever? |
| 21 | A. | No, sir. |

*Id.*, at 491-93.

The Supreme Court of Nevada rejected the claim presented to that court on the following grounds:

> . . . [A]ppellant claimed that his trial counsel was ineffective for inviting Deputy Spinuzzi to (1) comment on appellant's prior criminal history; (2) opine that appellant molested his other daughter; and (3) state that the abuse had gone on for an extended period of time. Appellant further claimed that his counsel also failed to request a limiting instruction. Appellant failed to demonstrate that he was prejudiced. The failure to conduct a <u>Petrocelli</u> hearing [re: the admission

-7-

>of other bad acts evidence] and give a limiting instruction is grounds for reversal unless either the record is sufficient for this court to determine that the evidence is admissible as bad act evidence or where the result would have been the same had the court not admitted the evidence. In this case, appellant failed to show that there was a reasonable probability of a different result at trial had the district court precluded testimony about appellant's prior criminal record because there was substantial evidence of guilt notwithstanding the prior bad act evidence. Therefore, the district court did not err in denying this claim.

#27-35, Ex. 104-B, at 21-22 (citation footnote omitted).

The state supreme court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court.

On a claim of ineffective assistance of counsel, a petitioner must satisfy the two-pronged test of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). He must demonstrate that: (1) counsel's performance fell below an objective standard of reasonableness; and (2) counsel's defective performance caused actual prejudice. On the performance prong, the issue is not what counsel might have done differently but rather is whether counsel's decisions were reasonable from his perspective at the time. The court starts from a strong presumption that counsel's conduct fell within the wide range of reasonable conduct. On the prejudice prong, the petitioner must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *E.g., Beardslee v. Woodford*, 327 F.3d 799, 807-08 (9th Cir. 2003).

While surmounting *Strickland*'s high bar is "never an easy task," federal habeas review is "doubly deferential" in a case governed by the AEDPA. In such cases, the reviewing court must take a "highly deferential" look at counsel's performance through the also "highly deferential" lens of § 2254(d). *Pinholster*, 131 S.Ct. at 1403 & 1410.

The state supreme court's conclusion that petitioner failed to demonstrate the requisite prejudice was not an objectively unreasonable application of *Strickland*, given the trial evidence summarized at the beginning of this order. Petitioner urges that the admission of the bad acts evidence denied him a fair trial under the Sixth Amendment. However, the United States Supreme Court has not held -- and thus had not held at the time of the November 19, 2008, state supreme court decision – that the admission of other bad acts evidence deprives a criminal defendant of a right to a fair trial. *See,e.g., Alberni v. McDaniel*, 458 F.3d 860, 863-67 (9th Cir. 2006). The state supreme court's implicit rejection

of petitioner's underlying premise that the admission of the evidence violated the Constitution thus was not contrary to clearly established federal law. With respect to an alleged violation of state law from the admission of the evidence, the state supreme court's determination that there were no grounds for reversal under Nevada state law based on the admission of the evidence on the facts presented is the final word in that regard, as the Supreme Court of Nevada is the final arbiter of Nevada state law.

Ground 1(f) accordingly does not provide a basis for federal habeas relief.[1]

---

[1] The Court does not by omission discount respondents' arguments directed to whether counsel's actions also represented reasonable trial strategy. The Supreme Court of Nevada based its decision on the prejudice prong of *Strickland*, and this Court thus has looked to this issue rather than to the performance prong.

At the very least in a case where the state court instead has decided the performance issue or has summarily rejected a claim on the merits, the federal court's review of counsel's decisions must be highly deferential:

> In *Strickland*, . . . [t]he Court acknowledged that "[t]here are countless ways to provide effective assistance in any given case," and that "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Id.*, at 689, 104 S.Ct. 2052.
>
> Recognizing the "tempt[ation] for a defendant to second-guess counsel's assistance after conviction or adverse sentence," *ibid.*, the Court established that counsel should be "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment," *id.*, at 690, 104 S.Ct. 2052. To overcome that presumption, a defendant must show that counsel failed to act "reasonabl[y] considering all the circumstances." *Id.*, at 688, 104 S.Ct. 2052. The Court cautioned that "[t]he availability of intrusive post-trial inquiry into attorney performance or of detailed guidelines for its evaluation would encourage the proliferation of ineffectiveness challenges." *Id.*, at 690, 104 S.Ct. 2052.
>
> . . . . .
>
> The [reviewing court must not overlook] "the constitutionally protected independence of counsel and ... the wide latitude counsel must have in making tactical decisions." 466 U.S., at 689, 104 S.Ct. 2052. Beyond the general requirement of reasonableness, "specific guidelines are not appropriate." *Id.*, at 688, 104 S.Ct. 2052. "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions ...." *Id.*, at 688–689, 104 S.Ct. 2052. *Strickland* itself rejected the notion that the same investigation will be required in every case. *Id.*, at 691, 104 S.Ct. 2052 ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary" (emphasis added)). It is "[r]are" that constitutionally competent representation will require "any one technique or approach." [*Harrington v. Richter*, 562 U.S. ––––, ––––, 131 S.Ct. 770, 779, 178 L.Ed.2d 624 (2011)] . . . . .

(continued...)

*Ground 3*

In Ground 3, petitioner alleges that he was denied his right to a fair trial in violation of the Sixth Amendment when the trial court allegedly failed to address and resolve his concerns regarding the preparedness of his counsel that he voiced on the second day of trial. Petitioner alleges that counsel had been unable to conduct basic voir dire without the court's assistance, "pled the defendant guilty before the jury," was unable to properly cross-examine the victim, and destroyed the defensive benefit of a child protective services investigation during the cross-examination of another investigator. Petitioner alleges that thereafter the "angry public defender destroyed the defendant."

---

[1](...continued)
> . . . . *Strickland* specifically commands that a court "must indulge [the] strong presumption" that counsel "made all significant decisions in the exercise of reasonable professional judgment." 466 U.S., at 689–690, 104 S.Ct. 2052. The [reviewing court is] required not simply to "give [the] attorneys the benefit of the doubt," . . . but to affirmatively entertain the range of possible "reasons . . . counsel may have had for proceeding as they did," . . . *See also Richter, supra*, at 1427, 131 S.Ct., at 791 ("*Strickland* ... calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind").

*Pinholster*, 131 S.Ct. at 1403 & 1407.

In the present case, the Court would note the following over and above respondents' observations regarding counsel's apparent tactical choices. Defense counsel in this instance appeared to be a "counter puncher." That is, rather than shy away from open-ended questions or otherwise risky topics, counsel instead relied upon his ability as a cross-examiner to either minimize what the State's witness was trying to do and/or to turn what at first might seem to be disadvantage to advantage. For example, when the officer unilaterally offered up petitioner's "criminal history that included armed assaults," counsel then forced the officer to concede that, in this "history," petitioner had no felony convictions and never had been in jail prior to the pending charges. This approach potentially tended to make the witness appear to be someone who was going out of his way to secure a conviction by attempting to unilaterally offer harmful information, who then exaggerated things, and who thus was not a reliable source of information or opinion. Similarly, when the officer referred to his belief that D.B. also had been molested, counsel was able to make the suggestion – even with his ESP reference technically being stricken – that the witness' opinions as to who was and was not telling the truth, including as to whether the victim was telling the truth, were grounded merely in his own subjective belief.

A different attorney perhaps might have skirted the issues and/or objected to the nonresponsive answers, thereby also possibly highlighting that he was trying to hide harmful information from the jury. This particular counsel, however, instead apparently opted to take the information in stride, portraying both by word and by overall approach that he was not hiding anything from the jury, with a witness trying hard to secure a conviction, and that what had come out in truth was not harmful to his client on balance. *Strickland* does not preclude such a tactical approach by counsel, as "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." 466 U.S. at 689, 104 S.Ct. 2052. The controlling law certainly does not measure counsel's effectiveness *post hoc* by whether or not a particular strategy succeeded in avoiding a conviction in the given case.

1     The defense opening at trial including the following:

2

3         By pleading guilty, Donald *has denied that he did this*. And I'm not sure that he's going to take the stand. He doesn't have to. *The State has to prove it beyond a reasonable doubt.*

4         THE COURT: By pleading not guilty.

5         MR. WARD: By pleading not guilty, Your Honor, I mean.

6

7         Ladies and gentlemen of the jury, we have not made that decision, and you'll be instructed on that later on.

8 #24-26, Ex. 23-C, at 152 (emphasis added).

9     Thereafter, during the remaining portion of the first day of trial, testimony was received from

10 the victim, L.B., and a child protective services investigator, Sevana Newman.[2]

11     At the opening of the second day of trial, defense counsel informed the trial court outside the

12 presence of the jury that Blankenship wished to address the court. The trial judge thereupon

13 immediately inquired as to petitioner's concerns:

14

15         THE DEFENDANT: Thank you, Your Honor. I have concerns about my defense, Your Honor. I don't know whether I'm being adequately defended. And this is for my life.

16

17         THE COURT: And what seems –

18         THE DEFENDANT: I don't believe that my attorney is prepared and understands fully the case he's prepping here. And yesterday when he addressed the Court – or the jury, he turned to me and said, and my

19 client pleads guilty to these charges.

20         Now, I'm sure that that was just a misunderstanding, or a misspoken word. But to the jury, I wonder how many ears were closed

21 because of that. And I'm not happy.

22 #24-28, Ex. 24-A, at 245.

23     The court responded, *inter alia*, that the misstatement immediately had been noted and corrected

24 before the jury, that it was clear that the jury knew and understood that petitioner had pled not guilty,

25 that the clerk had read the charges and stated that petitioner had pled not guilty, and that the jury was

26 not under any misapprehension whatsoever. The court expressly found that the statement was harmless

27 _____

28     [2]See ## 24-26 & 24-27, Exhs. 23-C & 23-D, at transcript pages 155-239.

-11-

beyond a reasonable doubt. The court offered, however, to state on the record that petitioner had pled not guilty.[3]

The court thereupon inquired as to what other concerns petitioner had:

> MR. WARD: Your Honor, I believe that he was commenting on his opinion that I was unprepared, as well.
>
> THE DEFENDANT: Mr. Ward is not prepared, sir. There were a couple of incidents during yesterday's interviews that Mr. Ward got the information wrong. For instance, my RV is a unit that I drive. If he had talked to me about this at all, he would know that.
>
> The conversation with the victim witness concerning Mr. Brandon Proctor, he was under the impression that Brandon Proctor had passed away before I became unhappy about [L.B.] being at this residence.
>
> He is not prepared. He does not understand the argument here. The gentleman is not prepared.
>
> He and I have not spent an hour at a table together since this entire business started. The – the indictment that the clerk read to the Court yesterday, I have never received a copy of that. As a matter of fact, when I was arraigned in your court, you asked me if I was aware of the consequences of these things, and I told you no, because I hadn't received this. I still don't have it. I'm just going by what I read here as to what this indictment is.
>
> I'm not happy with my representation. And, Your Honor, each one of these charges is for my life. And this is not nothing to be fooled with, as far as I'm concerned. And if I don't stand up for myself, obviously my attorney is not going to.

#24-28, Ex. 24-A, at 247-48.

The judge responded initially that it was his recollection that defense counsel had advised when the matter was set for trial that it would be to petitioner's advantage to have the trial set a month later. However, it was Blankenship's own choice to instead have the trial set within the –state statutory – sixty-day speedy trial period following the information.[4]

The court further observed and found, *inter alia*:

> THE COURT: Okay. This Court has been in court. The Court

---

[3]#24-28, Ex. 24-A, at 245-46.

[4]*Id.*, at 248.

> understands the – the arguments of Mr. Blankenship. The Court has heard the evidence, the witnesses, the cross examination, the direct examination. And I'm going to tell you right now, Mr. Blankenship, you're entitled to a fair trial. You're entitled to adequate representation.
>
> This Court finds at this point that you've received adequate representation.
>
> . . . . .

#24-28, Ex. 24-A, at 248-49.

Instruction No. 7 of the closing instructions, after reading the charges from the information, specifically stated:

> To this, the defendant, DONALD BLANKENSHIP, JR., entered his plea of "Not Guilty."

#25-3, Ex. 26.

Defense counsel in closing argument specifically emphasized:

> When my client, Donald Blankenship, entered a plea of not guilty, he denied each and every one of these things. Everything that happened, he denied it. And for good reason, because it didn't happen.

#25-2, Ex. 25-B, at 550.

On direct appeal, petitioner contended, *inter alia*, that the trial court erred in not allowing him to obtain new counsel, citing to cases applying the Sixth Amendment, and urging that he accordingly was denied a fair trial with effective assistance of counsel. Excerpts from the colloquy during which petitioner voiced his concerns at the beginning of the second day of trial were presented as the factual basis for the claim.[5]

The state supreme court rejected the above substantive claim, in pertinent part, on the following grounds:

> . . . . In opening statements, defense counsel stated, "By pleading guilty, Donald has denied that he did this." The district court promptly interrupted defense counsel and said, "By pleading not guilty." Donald's counsel then clarified himself, stating, "By pleading not guilty, Your Honor, I mean." Outside the presence of the jury, Donald told the trial judge:

---

[5] #25-27, Ex. 50, at 11-13 & 28-32.

> The Defendant: Thank you, Your Honor. I have concerns about my defense, Your Honor. I don't know whether I'm being adequately defended. And this is for my life.
>
> The Court: And what seems -
>
> The Defendant: I don't believe that my attorney is prepared and understands fully the case he's prepping here. And yesterday when he addressed the Court - or the jury, he turned to me and said, and my client pleads guilty to these charges.
>
> Now, I'm sure that that was just a misunderstanding, or a misspoken word. But to the jury, I wonder how many ears were closed because of that. And I'm not happy.
>
> The trial judge responded that he corrected the misstatement at that time and also agreed to restate to the jury that Donald pleaded not guilty. The district court found that the statement of defense counsel was harmless beyond a reasonable doubt.
>
> Donald then told the judge that his attorney was not prepared and did not understand his arguments. The district court found that defense counsel provided Donald with adequate representation. Then the court instructed Donald to mention any other concerns Donald had with his attorney and the court would address them.
>
> During closing arguments, Donald's counsel reiterated that "[w]hen my client, Donald [B.], entered a plea of not guilty, he denied each and every one of these things. Everything that happened, he denied it. And for a good reason, because it didn't happen."
>
> The district court took time on the record to address Donald's concerns about his counsel. The district court informed Donald that it corrected defense counsel's misstatement and then reinstructed the jury that he pleaded not guilty. The district court did not err because it specifically addressed Donald's concerns about his counsel and instructed Donald to bring up any other problems. . . . .

#25, Ex. 54, at 13-14 (excluding discussion of related ineffective-assistance claim).

The state supreme court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court.

The Sixth Amendment guarantees a defendant effective assistance of counsel, but it does not require that a defendant must be represented only by an attorney that the defendant himself subjectively believes is adequate. *See,e.g., Morris v. Slappy*, 461 U.S. 1, 11 & 13-14, 103 S.Ct. 1610, 1616 & 1617, 75 L.Ed.2d 610 (1983); *Plumlee v. Masto*, 512 F.3d 1204, 1210-11 (9th Cir. 2008)(*en banc*).

In the present case, the state trial court inquired immediately into petitioner's concerns when they first were raised. Petitioner's principal concern about the – immediately corrected – gaffe during the opening statement simply was overblown. The Constitution provides no guarantee against such a slip of the tongue that is immediately corrected. Otherwise, petitioner has identified nothing specific of substance in counsel's handling of the voir dire that demonstrated that counsel was unable to provide effective assistance.[6] This Court further has reviewed the cross-examination of the victim and the child protection services investigator and found nothing of substance reflecting that petitioner was not being represented effectively. For example, the fact that defense counsel initially thought that Blankenship and the children were living in a trailer that was towed rather than in a recreational vehicle that could be driven is meaningless minutiae. Petitioner's concerns perhaps may have been sincere and deeply felt, but his concerns nonetheless did not turn what in truth were molehills into mountains. The state district court's determination at the time of the inquiry that petitioner had received adequate representation is entitled to deference on review under AEDPA and is well supported by the state court record.[7]

---

[6] Petitioner points to 1 page in the 87 pages of the trial transcript covering the voir dire where defense counsel referred to a credibility instruction that the court was going to give, tried with only limited success to frame a concise question involving the instruction, and the state district court interjected and framed the question. See #30, at electronic docketing page 74; #24-25, Ex. 23-B, at 68-69. It is difficult to conceive of a less compelling showing of ineffective assistance of counsel. Review of the entire transcript of the voir dire reflects that petitioner was ably represented during voir dire. See ## 24-24 & 24-25, Exhs. 23-A & 23-B, at 12-99. It hardly is an uncommon occurrence for a trial judge, who repeatedly frames the same voir dire questions in countless trials, to interject and move the process along.

[7] The state trial court's reference to petitioner's decision to enforce his – state statutory – right to a speedy trial within sixty days does not present a substantial issue. To the extent, if any, that petitioner's insistence on a trial within sixty days *arguendo* crimped his counsel's trial preparation, that does indeed represent the consequence of a choice by the petitioner. The criminal defendant is in the driver's seat in that regard, as to whether to insist on trial within the state statutory speedy trial period or instead to seek more time for trial preparation. If counsel had been representing that he needed more time and petitioner nonetheless insisted that he be tried within the sixty day period, that is a tactical decision that petitioner himself made. *Cf. United States v. Palomba*, 31 F.3d 1456, 1462 (9th Cir. 1994)(defendant could not make informed choice to seek more time for trial preparation and then object that his statutory right to a speedy trial had been violated). The speedy trial right in this instance is a state statutory right, not the speedy trial right under the Sixth Amendment, which is addressed to longer intervals of time.

The Court further notes that counsel stated at least on the record at the trial confirmation hearing that petitioner did not waive his statutory right to a speedy trial and that "we have retained the services of an investigator that has talked to my client at length, and we should be able to go on the [trial date] if that day is available." #24-14, Ex. 13, at 3.

In all events, however, the salient point in this particular regard is that the trial court inquired immediately when
(continued...)

The fact that the state trial court did not unilaterally inquire again later in the trial specifically as to whether petitioner then was satisfied with the representation is not a matter of moment. Petitioner had demonstrated his capacity to make his concerns known to the court even when not prompted by the court to do so, and his lawyer had not sought to stand between him and the court when he did so. If petitioner in fact had continuing concerns later in the trial and the trial court did not unilaterally inquire, it was incumbent upon petitioner to again seek to speak to the judge about the issue outside the presence of the jury. He could not sit silently with continuing concerns, fail to pursue the issue further at all during the trial, and then later claim error based upon the trial court's failure to itself follow through at a later point in the trial.[8]

On direct appeal, petitioner pointed to the fact that defense counsel presented no witnesses as evidence of his lack of preparation.[9] However, the trial record clearly shows that the decision to not present any witnesses was a tactical decision made with petitioner's full participation. Indeed, petitioner expressly confirmed on the record that his counsel's statement that "it was basically his idea," meaning Blankenship himself, was correct.[10] Petitioner of course may not successfully base a claim of constitutional error upon a tactical decision that he himself made.

Petitioner suggests in the reply that the transcript of the colloquy on the second day of trial is incomplete. He relies on the fact that the clerk's minutes state, *inter alia*, that "defendant advised court he felt he was not being properly represented and wanted a new attorney and a new trial." #24, Ex. 9,

---

[7](...continued)
petitioner voiced concerns as to his counsel's level of preparation, and the court made a determination that is supported by the record that petitioner was being adequately represented. While petitioner may have opted for a speedier trial at the, possible, expense of his counsel's trial preparation, the state trial court's key determination that he nonetheless was receiving adequate representation is supported by the record.

[8] See also note 10, *infra*.

[9] #25-27, Ex. 50, at 32.

[10] #25, Ex. 25-A, at 524-26. The Court notes that – immediately after the discussion regarding the defense not calling witnesses – the trial court asked: "Now, is there anything else that we need to talk about?" Blankenship said nothing, whether about any continuing concerns about counsel's preparation or any other issue. A defendant – who only an instant before had been engaged in direct discussion with the trial court – cannot simply stand idly by, not raise a concern in response to a question as to whether there were other matters that needed to be addressed, and then later claim that the trial court failed to effectively follow through on an issue.

1  at 2-3. The transcript contains no express request by petitioner for "a new attorney and a new trial."
2  Petitioner suggests that the transcript therefore is incomplete. This argument misses the mark. The
3  transcript controls over the minutes, and it was hardly a substantial leap of logic for the clerk to infer
4  from petitioner's raising of the issue that petitioner was seeking a new trial with new counsel rather than
5  going forward with counsel that he did not feel was prepared. Petitioner's strained suggestion in the
6  reply that the trial transcript, in this and other places, has been redacted or edited merely highlights the
7  extent to which petitioner is clutching at straws in his argument.[11]

8        On the record presented in the state courts, the state supreme court's rejection of this claim was
9  neither contrary to nor an unreasonable application of clearly established federal law.

10        Ground 3 therefore does not provide a basis for federal habeas relief.[12]

11        IT THEREFORE IS ORDERED that the petition shall be DENIED on the merits and that this
12  action shall be DISMISSED with prejudice.

---

[11] Similarly, petitioner's repeated references to defense counsel having to be compelled by subpoena to appear for trial represents nothing more than clutching at straws. Petitioner relies upon a cryptic entry from a partial excerpt from an unauthenticated inmate events log at the county jail. See #30, at electronic docketing page 72. An entry reads "Ken Ward served subpoena to appear in 3rd District," with no further indication as to the case or subject matter to which the subpoena pertained. At the time, the cryptic entries appear to reflect that defense counsel was at the jail *meeting with petitioner*, hardly a reflection of lack of attention to the case. The court minutes do not reflect that the trial was delayed on account of defense counsel allegedly having to be subpoenaed to be present. See #24-10, Ex. 9. The trial transcript instead starts with, *inter alia*, defense counsel announcing present and ready to proceed, with no reference to defense counsel allegedly having had to be compelled by subpoena to appear. See #24-24, Ex. 23, at 6. In short, nothing in the state court record corroborates petitioner's reading of a cryptic entry in a jailhouse events log to suggest that an AWOL defense counsel had to be tracked down at large and then dragged before the court by way of subpoena with no anticipation of being in court for trial and utterly unprepared to proceed.

[12] The Court is not persuaded by respondents' contention that Ground 3 is not fully exhausted because petitioner alleges therein that the trial court never made the offered statement to the jury that he had pled not guilty. Petitioner did in fact make this same factual allegation in the claim presented on direct appeal. See #25-27, Ex. 50, at 12, n.4. The Court thus is not persuaded by respondents' argument concerning exhaustion. The Court further would note that the trial court thereafter did state to the jury, in Instruction No. 7, that petitioner had pled not guilty.

However, petitioner does include allegations in federal Ground 3 that are not included in the claim presented to the Supreme Court of Nevada, including allegations regarding alleged deficiencies in counsel's conduct of the voir dire and cross-examination as well as the allegation that the angry public defender thereafter destroyed the defendant in the remainder of the trial. Compare #25-27, Ex. 50, at 12, lines 17-23 (supporting facts in direct appeal brief) with #10, at 25-26 (federal Ground 3). Even if this Court were to review Ground 3 *de novo* – on an assumption that the claim had not been exhausted and that procedural default could be overcome – it would reach the same conclusion on the merits that it reaches on deferential AEDPA review. At bottom, petitioner's concerns as to trial counsel's preparation and effectiveness at trial were overblown and were appropriately – after an immediate inquiry that was adequate to the circumstances – discounted by the state trial court.

1  IT FURTHER IS ORDERED that a certificate of appealability is DENIED. Reasonable jurists would not find debatable or wrong this Court's conclusion that the state supreme court's rejection of the claims presented was neither contrary to nor an unreasonable application of clearly established federal law, for the reasons assigned herein.

The Clerk of Court shall enter final judgment accordingly in favor of respondents and against petitioner, dismissing this action with prejudice.

DATED this 21st day of February, 2012.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE